**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TK KEYSTONE CONSTRUCTION COMPANY, INC.** : | **CIVIL ACTION** |
| **Philadelphia, PA 19120** : | |
|                         **Plaintiff,** : | **NO.** |
|       **v.** : | |
| : | **JURY TRIAL DEMANDED** |
| **SOUTHEASTERN PENNSYLVANIA** : | |
|  **TRANSPORTATION AUTHORITY** : | |
| **a/k/a SEPTA** : | |
| **Philadelphia, PA 19107** : | |
|                    **Defendant.** : | |

## COMPLAINT

### I.    PRELIMINARY STATEMENT

Plaintiff, TK Keystone Construction Company, Inc. ("TK"), is a private corporation that offers janitorial, maintenance, landscaping and related services to its customers. Thoa Vu ("Thoa") is the sole owner, principal and Chief Executive Officer of TK. Thoa is a non-white, Asian-American female. Defendant, Southeastern Pennsylvania Transportation Authority ("SEPTA"), is a regional public transportation authority that operates bus, rapid transit, computer rail and other services for residents of Philadelphia and the surrounding counties. Prior to 2017, TK had successfully bid on a number of SEPTA contracts to provide services at various SEPTA facilities, sites and locales. TK performed those contracts proficiently and was recognized by SEPTA for its good performance. This action alleging racial discrimination, sex discrimination and unlawful retaliation arises from decisions by SEPTA to select vendors other than TK to perform two lucrative contracts for SEPTA, one at Suburban Station, and the other at Jefferson and Suburban Stations (individually, "Contract" and collectively, "Contracts"). SEPTA did not award the Contracts to TK even though TK was the lowest responsible bidder for

both Contracts; the vendor that was awarded the first Contract did not submit a bid; and the vendor that was awarded the second Contract had not previously worked for SEPTA and submitted a bid that was more than $4.3 million higher than TK's.  The vendors that SEPTA selected instead of TK to perform the Contracts are owned, controlled and/or dominated by white persons, and primarily, white males.  Had SEPTA awarded the Contracts to TK, SEPTA and the taxpayers would have saved more than $5 million.  TK alleges that SEPTA discriminated against it in violation of 42 U.S.C. §1981 ("§1981"), 42 U.S.C. §1983 ("§1983") and 42 U.S.C. §2000d (Title VI of the Civil Rights Act of 1964, known here as "Title VI"), by excluding TK from, and denying it the benefits of the Contracts on the basis of race and sex.  TK contends also that SEPTA violated §1981, §1983 and Title VI by awarding second Contract to another, more expensive vendor in retaliation for TK's previous complaint to SEPTA that was prompted by its exclusion from the first Contract.  TK alleges that this complaint was sufficient to put SEPTA on notice that TK was claiming it was excluded from the first Contract because race and/or sex.   TK further alleges that the discriminatory and retaliatory acts of SEPTA violated §1983 because they were the official policy of SEPTA, as authorized, approved and directed by SEPTA's board of directors (the "Board"), which has final policymaking and decisionmaking authority under Pennsylvania law to make and enter into contracts on behalf of SEPTA.  To remedy SEPTA's constitutional and statutory violations, TK seeks relief in the form of, inter alia, compensatory damages for loss of income and lost profits, damages for harm to reputation, attorney's fees and costs.

## II.   JURISDICTION AND VENUE

1.     This Court has jurisdiction over the action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) and (4).

2.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because SEPTA resides in this district, the events and occurrences giving rise to the claims occurred here, and SEPTA is subject to personal jurisdiction here.

## III.   PARTIES

3.     TK is a Pennsylvania corporation formed in 2010 with a principal place of business located in Philadelphia.

4.     TK is and at all relevant times has been a "person" for the purposes of §1981, §1983 and Title VI.

5.     TK has at all relevant times offered and provided janitorial, maintenance, landscaping, groundskeeping, snow removal and related services to its customers.

6.     Thoa is and at all relevant times has been the sole owner, principal and Chief Executive Officer of TK.

7.     Thoa is a non-white, Asian-American female.

8.     On account of its ownership by non-white Asian-American female, TK was at all relevant times recognized and certified by SEPTA as a "Disadvantaged Business Enterprise," the commonly-used acronym for which is "DBE."

9.     SEPTA is and at all relevant times has been a regional public transportation authority that operates bus, rapid transit, computer rail, light rail, and electric trolleybus services for millions of people in Philadelphia and the surrounding counties.

3

10.    SEPTA is and at all relevant times has been an agency and/or instrumentality of a municipality as well as a "person" as defined by §1983.

11.    SEPTA is and at all relevant times has been the recipient of federal financial funding and assistance from, among other sources, the United States Department of Transportation ("DOT").

12.    SEPTA is and at all relevant times has been a "program or activity receiving Federal financial assistance," as defined by Title VI.

13.    SEPTA is and at all relevant times has been governed by the Board which, as SEPTA's governing body under Pennsylvania law, has final policymaking and decisionmaking authority with regard to, inter alia, making and entering into contracts on behalf of SEPTA, including the Contracts that are at issue here.

14.    SEPTA at all relevant times acted by and through its duly authorized, agents, representatives, policymakers and decisionmakers, including the Board.

15.    SEPTA's headquarters and principal place of business are located in Philadelphia.

IV.    **STATEMENT OF FACTS**

   A.    **SEPTA's Policies and Procedures Pertaining to Bidding on Contracts**

16.    At all relevant times, SEPTA's policies and procedures pertaining to competitive bidding on contracts have required SEPTA to award contracts to the "Lowest Responsible Bidder."

17.    SEPTA's policies and procedures pertaining to competitive bidding are in conformity with Pennsylvania law, which provides, in relevant part, that contracts "shall be awarded to the lowest responsive, responsible bidder."

4

18. As a recipient of federal financial funding and assistance from DOT, SEPTA is and at all relevant times has been required to comply with the pertinent DOT rules and regulations pertaining to Disadvantaged Business Enterprises.

19. Consistent with DOT rules and regulations, SEPTA's procedural and policy manual, published on or about December 12, 2016, states, in relevant part, that "[i]t is the policy of the [DOT] that [DBEs], as defined by 49 CFR Part 26, shall have the equal opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with federal funds;" that "SEPTA . . . agree[s] that [DBEs] . . . have the equal opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with federal funds;" and that "SEPTA . . . shall take all necessary and reasonable steps in accordance with 49 CFR Part 26 to ensure that [DBEs] have maximum opportunity to compete for and perform contracts."

20. On August 28, 2017, SEPTA issued a "Policy Statement" regarding its DBE program which states, in pertinent part, that "[i]t is the policy of SEPTA to ensure that DBEs . . . have an equal opportunity to receive and participate in DOT-assisted contracts," and that SEPTA shall "[e]nsure non-discrimination in the award and administration of DOT-assisted contracts."

21. As explained below, SEPTA violated and disregarded the said rules, regulations and Policy Statement by excluding TK from, and denying it the benefits of the Contracts on the basis of race and sex.

**B.   TK's History with SEPTA**

22.     Prior to the acts and practices of discrimination alleged herein, TK had successfully bid on a number of SEPTA contracts to perform services at various SEPTA facilities, sites and locales.

23.     By way of example, in July 2013, SEPTA awarded TK, as the successful bidder, a five-year contract to perform janitorial, snow removal and landscaping services at SEPTA's 30th Street and University Stations; and in December 2013, TK was the recipient of a five-year contract to provide janitorial and recycling services for SEPTA's Regional Railroad Division at various outlying SEPTA stations.

24.     Prior to the acts and practices of discrimination set forth herein, TK had consistently met or exceeded SEPTA's expectations and requirements of the contracts it performed for SEPTA; and because of TK's superior performance, SEPTA had awarded TK additional work for special projects, including the Papal Visit to Philadelphia in September of 2015.

25.     On June 3, 2015, Robert Robinson, SEPTA's Director of Administration for its Rail Transportation Department, acknowledged in writing that TK "has met all contractual requirements" with regard to the contract under which TK was performing services for SEPTA at the 30th Street and University Stations, and that TK was "in good standing" with SEPTA.

C.   **SEPTA Unfairly and Discriminatorily Deprives TK of Its Right and Entitlement to Perform a Contract at Suburban Station for Which TK was the Successful and Lowest Responsible Bidder**

26.     Center City District ("CCD") is a private sector-sponsored business improvement district that was established in 1991 pursuant to the Commonwealth of Pennsylvania's Municipal Authorities Act.

27.     The stated mission of CCD is to provide a clean, safe and well-managed environment in Center City Philadelphia.

28.     Paul Levy ("Levy"), a white male, is the founding Chief Executive Officer of CCD; and at all relevant times, Levy has served in the dual capacity of President and CEO of CCD.

29.     The board of directors and the executive–leadership team of CCD are and at all relevant times have been made up of and dominated by white persons, and in particular, white males.  For example, of the approximately thirty-seven current board members of CCD, approximately thirty-five are white (thirty-one white males and four white females).

30.     CCD is not, and at no time relevant to this action has it been recognized or certified by SEPTA as a DBE.

31.     In 2017, and for a number of years prior thereto, CCD was a party to contract with SEPTA pursuant to which CCD performed janitorial, maintenance and related services for SEPTA at its Jefferson and Suburban Stations (the "First CCD-SEPTA Contract").

32.     As set forth therein, the expiration date of the First CCD-SEPTA Contract was December 31, 2017.

33.    SEPTA was dissatisfied with various aspects of CCD's performance with regard to the First CCD-SEPTA Contract.

34.    Prior to May 16, 2017, CCD informed SEPTA that it did not wish to continue providing services for SEPTA at Jefferson or Suburban Station after the First CCD-SEPTA Contract expired on December 31, 2017.

35.    On May 16, 2017, after CCD had informed SEPTA that it had no interest in performing services for SEPTA at Jefferson or Suburban Station after December 31, 2017, SEPTA announced in writing, pursuant to its competitive bidding procedures, that it would be accepting sealed bids for a new five-year contract "to provide Janitorial and Maintenance Services at Suburban and Jefferson Stations," with the work to begin on January 1, 2018 ("New Jefferson-Suburban Contract").

36.    SEPTA further announced in writing on May 16, 2017 (the "May 16, 2017 Announcement") that sealed bids for the New Jefferson-Suburban Contract would be accepted until June 21, 2017, at which time the bids would "be publicly opened and read aloud."

37.    The May 16, 2017 Announcement further stated that in accordance with Title VI and the applicable DOT regulation, DBEs "will be afforded full opportunity to submit bids in response to this invitation, and will not be discriminated against on the grounds of race, sex, color, or national origin in consideration for an award."

38.    The May 16, 2017 Announcement further stated that in order for a sealed bid for the New Jefferson-Suburban Contract to be considered, the bidder was required to attend a "Mandatory Pre-Bid Meeting" on May 31, 2017, followed by a "Mandatory Site Visit" on the same day.

39.     After receiving the May 16, 2017 Announcement, TK decided to bid on the New Jefferson-Suburban Contract.

40.     Pursuant to SEPTA's policies, procedures, rules, regulations and/or guidelines, TK did, in fact, submit a timely sealed bid to SEPTA for the New Jefferson-Suburban Contract.

41.     As required by SEPTA and as set forth in the May 16, 2017 Announcement, TK attended the Mandatory Pre-Bid Meeting on May 31, 2017, and it participated in the Mandatory Site Visit on the same day.

42.     Because CCD had informed SEPTA that it had no interest in providing services for SEPTA at Jefferson or Suburban Station after December 31, 2017, CCD did not submit a bid for the New Jefferson-Suburban Contract, and it declined to participate in any way in the bidding process.

43.     On June 16, 2017, SEPTA announced in writing that the bid opening for the New Jefferson-Suburban Contract, for which TK had submitted a timely bid, had been rescheduled from June 21, 2017 to June 26, 2017 ("June 16, 2017 Announcement").

44.     The June 16, 2017 Announcement included an addendum that stated, in part, that the term of the New Jefferson-Suburban Contract would be five years (January 1, 2018 to December 31, 2022).

45.     At the public bid opening on June 26, 2017, SEPTA announced that TK was the Lowest Responsible Bidder for the Suburban Station component of the New Jefferson-Suburban Contract ("New Suburban Station Contract"), but not for the Jefferson Station component.

46.     Under SEPTA's policies and procedures, it had the right to award the separate components of the New Jefferson-Suburban Contract (Suburban Station and Jefferson Station) to different bidders, provided that each was the Lowest Responsible Bidder for one of the components.

47.     TK's final bid price for the New Suburban Station Contract, which was accepted by SEPTA, was $5,968,989, to be paid by SEPTA to TK over the five-year term of the New Suburban Station Contract.

48.     On or about July 5, 2017, after TK had been determined by SEPTA to be the Lowest Responsible Bidder for the New Suburban Station Contract, TK received from Marian Keating ("Keating"), SEPTA's Contract Administrator for the Procurement, Supply Chain and DBE Division, an "Intent to Award Letter" regarding the New Suburban Station Contract.

49.     The Intent to Award Letter stated, in relevant part, that TK was "the apparent low bidder of the Janitorial and Maintenance Services at [New] Suburban Station Contract," with a start date of January 1, 2018, and that SEPTA was requesting that TK produce a Certificate of Insurance ("COI") "in order to receive the contract, early October [2017]."

50.     The Intent to Award Letter included an addendum, prepared by SEPTA, which congratulated TK for being "the low bidder for Janitorial and Maintenance Services Contract at SEPTA's Suburban Station."

51.     Under SEPTA's longstanding practice, an Intent to Award Letter such as the one that TK received from SEPTA on or about July 5, 2017 has preceded the

preparation of a purchase order and has generally served as notice to the successful

bidding contractor to begin preparations for work on the contract.

52.     Accordingly, after receiving the Intent to Award Letter, TK took

reasonable and appropriate steps to prepare for its work on the New Suburban Station

Contract, which included recruiting more than one hundred potential workers;

conducting background checks and interviews; shopping for materials and supplies;

creating material delivery schedules and replenishment techniques; and purchasing

uniforms at a cost to TK of approximately $25,000.

53.     On July 6, 2017, Keating sent an e-mail to Thoa which stated, in part, that

there was "[n]o rush on the COI . . . but I will need it before my request for Contract

Award goes to the September [2017] Board."

54.     Although Keating had assured Thoa that there was "no rush," TK

promptly provided SEPTA with the requested COI, and on July 10, 2017, Keating sent

an e-mail to TK confirming her receipt of the COI and stating that because "the project

doesn't start [until] the first of the year [2018] this is good for the file."

55.     Keating's July 10, 2017 e-mail further informed TK that "[w]hen [the] time

comes for the award [of the New Suburban Station Contract] I will just need a letter from

your insurance company stating TK Keystone will be able to get the CG2417

[endorsement] when needed."

56.     TK provided to SEPTA, in a timely and complete manner, all insurance

information that SEPTA requested with regard to the New Suburban Station Contract.

57.     On July 13, 2017, Keating sent an e-mail to Thoa requesting that TK provide SEPTA with additional information that would enable TK to commence work on the New Suburban Station Contract.

58.     The specific information that Keating requested in her July 13, 2017 e-mail was a list of references, a breakdown of labor costs, a list of materials, and a list of equipment.

59.     On or about July 18, 2017, TK provided SEPTA with the information Keating had requested on July 13, 2017; and after receiving that information from TK, Keating sent an e-mail to TK on July 18, 2017, thanking it "for pulling the requested information together."

60.     On or about July 18, 2017, Keating informed TK in writing that the breakdown of TK's labor costs for the New Suburban Station Contract was not in compliance with the City of Philadelphia's Wage Compliance Rate of $12.10 per hour.

61.     In response to Keating's correspondence relating to the Wage Compliance Rate, TK reminded Keating that it had previously been awarded a SEPTA contract (performed in Philadelphia) with no request or requirement that TK comply with the Wage Compliance Rate.

62.     Nevertheless, TK resubmitted to SEPTA, in a timely manner, its cost breakdown for the New Suburban Station Contract, thereby increasing the salaries of TK's workers to comply with the Wage Compliance Rate, and at the same time lowering TK's profit margin while maintaining the original contract price.

63.     On July 22, 2017, Thoa sent an e-mail to Jeffrey Knueppel ("Knueppel"). General Manager of SEPTA, informing him that "I am looking forward to taking over Suburban Station in January [2018] and taking the cleanliness to a new standard."

64.     On or about August 7, 2017, Pasquale T. Deon, Sr., Chairman of the SEPTA Board, sent letters to various politicians which stated, inter alia, that SEPTA was "pleased to be doing business with TK" and thanked TK for its "continued support to Pennsylvania public transportation."

65.     When it bid for and was determined by SEPTA to be the Lowest Responsible Bidder for the New Suburban Station Contract, and at all relevant times thereafter, TK continued to maintain its status as a DBE.

66.     Notwithstanding SEPTA's issuance to TK of the Intent to Award Letter and its determination that TK was the Lowest Responsible Bidder, Keating sent a puzzling e-mail to TK on September 28, 2017, informing it that "[a] decision has not been made on the award of the Janitorial and Maintenance Services contracts for Jefferson and Suburban Stations."

67.     Keating further informed TK in her e-mail of September 28, 2017 that SEPTA was requesting "a 30 day time extension on [TK's] bid for the Janitorial and Maintenance Services at Suburban Station Contract" and that TK should "hold [its] bid price(s) [until] October 26, 2017."

68.     SEPTA asked for a thirty-day extension to review TK's bid for the New Suburban Station Contract even though it had already determined that TK was the Lowest Responsible Bidder; it had issued the Intent to Award Letter to TK; TK had

complied with all contractual requirements and requests for information; and TK had already gone to great lengths to prepare for performing the Contract.

69.    Because Keating's September 28, 2017 e-mail did not state or suggest that the New Suburban Station Contract would be awarded to a contractor other than TK, when TK received the e-mail, it did not suspect or believe that it was a victim of discrimination.  On the contrary, TK continued to expect and believe that it would be allowed to perform the New Suburban Station Contract (for a five-year term) beginning on January 1, 2018, in accordance with the Intent to Award Letter, the previous e-mails and correspondence it received from SEPTA, and SEPTA's policies and procedures.

70.    TK's belief and expectation changed on October 20, 2017, when SEPTA's Assistant General Manager of Procurement, Nilesh Patel ("Patel"), relayed the stunning news to Thoa in a telephone call that a decision had been made by SEPTA to "re-award" the New Suburban Station Contract to a contractor other than TK.

71.    After being informed by Patel of the "re-award," Thoa told Patel during their October 20, 2017 phone call that TK had already made preparations to perform the New Suburban Station Contract and had incurred expenses for the purchase of uniforms at a cost to TK of approximately $25,000; and when Patel offered to reimburse TK for the cost of the uniforms to "make [TK] whole," Thoa responded by informing Patel during the phone call that TK could not be "made whole" unless it was allowed to perform the Contract.

72.    When Thoa told Patel at the end of their October 20, 2017 phone call that she would be consulting with an attorney to discuss bringing a claim against SEPTA,

14

Patel urged Thoa not to consult with a lawyer, and he assured Thoa that he would call her again on October 23, 2017, to further discuss the matter.

73.     However, Patel did not call or contact Thoa after their phone call of October 20, 2017.

74.     As TK later discovered, SEPTA used the excuse of requesting a thirty-day extension to review TK's bid for the New Suburban Station Contract so that it could negotiate and enter into a new contract with CCD, under which CCD was hired by SEPTA to perform the services at Suburban Station that TK should have be allowed to perform beginning on January 1, 2018.

75.     On or about October 26, 2017, the SEPTA Board bypassed and circumvented TK as the Lowest Responsible Bidder for the New Suburban Station Contract, and it authorized and directed SEPTA to enter into a new contract with CCD to provide maintenance and janitorial services at both the Suburban and Jefferson Stations during the eleven-month period from January 1, 2018 to November 30, 2018, for a price not to exceed $2,866,000 ("Second CCD-SEPTA Contract").

76.     The Second CCD-SEPTA Contract was approved, authorized and directed by the SEPTA Board without TK's knowledge or consent, and despite the fact that CCD had not submitted a bid for the New Jefferson-Suburban Contract, and the fact that the Board knew TK was the Lowest Responsible Bidder for the New Suburban Station Contract.

77.     In authorizing and directing SEPTA to enter into the Second CCD-SEPTA Contract with CCD, the Board shortened the term of what was to have been the New Suburban Station Contract from five years to eleven months.

15

78.     The First CCD-SEPTA Contract, which expired on December 31, 2017, did not include material terms of the Second CCD-SEPTA Contract, i.e., the contract price or the eleven-month term.

79.     Because CCD did not submit a bid for the New Jefferson-Suburban Contract and SEPTA determined that TK was the Lowest Responsible Bidder for the New Suburban Station Contract, it was improper under SEPTA's policies and procedures for it to deny TK the right to perform the New Suburban Station Contract and to enter into the Second CCD-SEPTA Contract with CCD.

80.     On October 26, 2017, Thoa, on behalf of TK, sent a letter to Thomas Babcock ("Babcock"), Vice-Chairman of the SEPTA Board, in which Thoa protested SEPTA's decision to "re-award" the Contract to CCD, which Thoa stated in her letter TK "had fairly won by bid process."

81.     Thoa's October 26, 2017 letter to Babcock, which constituted notice to the SEPTA Board, included the following additional statements:

- That TK, in its capacity as a registered DBE, had complied with all procedures and document production requests with regard to its bid for the New Suburban Station Contract.

- That on June 26, 2017, SEPTA had announced that TK was the Lowest Responsible Bidder for the New Suburban Station Contract.

- That on July 5, 2017, TK had received an Intent to Award Letter from SEPTA, congratulating it for being the Lowest Responsible Bidder for the New Suburban Station Contract.

- That after receiving the Intent to Award Letter, TK was asked by SEPTA to provide a current COI as a condition to completing a requirement of the New

16

Suburban Station Contract, and TK had produced the requested COI.

- That Patel had informed Thoa on October 20, 2017 that a decision had been made by SEPTA to "re-award" the New Suburban Station Contract to another contractor.

- That the "re-awarding" of the Contract to another contractor was not in compliance with SEPTA's process and protocols, especially when TK had been determined to be the Lowest Responsible Bidder.

- That TK had performed other contracts for SEPTA and had been "consistently commended for [its] high caliber work rendered to [SEPTA]."

- That it was unfair to TK for SEPTA to "overturn" the award of the New Suburban Station Contract and to give the work at Suburban Station to another contractor who, according to TK's understanding, had not submitted a bid.

- That SEPTA's conduct was "grossly unfair and patently outside of SEPTA's rules and normal business practice of governmental contractual engagement."

82.   TK's October 26, 2017 letter to Babcock was protected activity for the purposes of §1981, §1983 and Title VI.

83.   Neither Babcock nor the Board responded to Thoa's October 26, 2017 letter.

84.   TK's contract price for the eleven-month term of the Second CCD-SEPTA Contract (January 1, 2018 to November 30, 2018) was substantially less than CCD's contract price for the New Suburban Station Contract for the same eleven months.

85.   Under the terms of the New Suburban Station Contract, which TK should have been allowed to perform as the Lowest Responsible Bidder, TK would have charged SEPTA a price of approximately $1.2 million per year, or $100,000 a month, for

17

its work at Suburban Station over the five-year term of the Contract, which would have worked out to a total price of approximately $1.1 million in the first eleven months.

86.     On the other hand, CCD's contract price for the Second CCD-SEPTA Contract for its work at both the Jefferson and Suburban Stations during the same eleven-month period, as agreed and authorized by SEPTA, was $2.866 million. Because approximately 65% of this amount should be allocated to Suburban Station, which is larger than Jefferson Station, TK estimates that SEPTA paid CCD a total of approximately $1.863 million, or about $169,000 per month, for CCD's work at Suburban Station in the first eleven months of 2018 (the full term of the Second CCD-SEPTA Contract).

87.     Accordingly, if SEPTA had allowed TK to perform the New Suburban Station Contract as the successful and Lowest Responsible Bidder, SEPTA and the taxpayers would have probably saved more than $750,000 in the first eleven months of 2018, calculated by comparing TK's contract price of approximately $1.1 million to CCD's contact price of approximately $1.863 million.

**D.     SEPTA Unfairly and Discriminatorily Deprives TK of the Right and Entitlement to Perform a New Contract at Suburban and Jefferson Stations Beginning on December 1, 2018, for which TK was the Lowest Responsive, Responsible Bidder**

88.     With CCD's work at Jefferson and Suburban Stations pursuant to the Second CCD-SEPTA Contract nearing completion, SEPTA solicited bid proposals through its "Request for Proposal" ("RFP") procedure for a new contract to perform janitorial and maintenance services at Jefferson and Suburban Stations for a five-year term beginning on December 1, 2018 ("2018-23 Jefferson-Suburban Contract").

89.    The RFP for the 2018-23 Jefferson-Suburban Contract was advertised in newspapers and posted on the Internet, with SEPTA establishing a due date of October 4, 2018 for the submission of all bids.

90.    TK was one of seven contractors that submitted timely bid proposals in response to the RFP; and once again, CCD did not submit a bid.

91.    When TK submitted its bid proposal to SEPTA pursuant to the RFP, it still maintained the status of a SEPTA-certified DBE.

92.    In October 2018, after receiving the seven bid proposals, SEPTA reviewed the "Initial Price Proposal" ("IPP") of each of the seven bidding contractors.

93.    The IPP that TK submitted to SEPTA for the 2018-23 Jefferson-Suburban Contract in response to the RFP was $4,708,826 for work at Jefferson Station and $6,762,626 for work at Suburban Station during the five-year term of the 2018-23 Jefferson-Suburban Contract, for a total IPP of $11,471,452.

94.    The IPP that TK submitted to SEPTA in response to the RFP was substantially lower than the IPPs of the other six contractors that responded to the RFP.

95.    After reviewing the IPPs of the seven contractors, and determining that TK's was the lowest, SEPTA proceeded to evaluate and determine which of the seven bid proposals submitted in response to the RFP was the "most advantageous" to SEPTA, taking into account the "Technical Ranking" and the "Best and Final Offer" ("BFO") of each of the seven bidding contractors.

96.    On or about October 19, 2018, TK submitted to SEPTA its BFO for the 2018-23 Jefferson-Suburban Contract, which matched, to the penny, its IPP of $11,471,452.

19

97.    On or about October 22, 2018, SEPTA announced that the 2018-23 Jefferson-Suburban Contract would be awarded to GDI Services, Inc. ("GDI"), a Canadian-based company whose board and executive–leadership team are made up of or dominated by white males.

98.    GDI is not, and to the best of TK's knowledge has never been certified by SEPTA as a DBE.

99.    SEPTA selected GDI over TK as the successful bidder for the 2018-23 Jefferson-Suburban Contract even though TK's BFO submitted to SEPTA in response to the RFP was more than $4.3 million lower than GDI's BFO.

100.    Specifically, GDI's BFO was $15,778,036 ($6,463,064 for work at Jefferson Station and $9,314,972 for work at Suburban Station), as compared to TK's BFO of $11,471,452.

101.    Because TK's BFO was more than $4.3 million lower than GDI's BFO, it would have been more advantageous to SEPTA and the taxpayers for SEPTA to have awarded the 2018-23 Jefferson-Suburban Contract to TK.

102.    However, SEPTA determined that awarding the 2018-23 Jefferson-Suburban Contract to GDI, and not to TK, was more advantageous to SEPTA.

103.    The SEPTA Board authorized and directed SEPTA to enter into the 2018-23 Jefferson-Suburban Contract with GDI, and to select GDI over TK for the Contract, despite SEPTA's and the Board's knowledge of the multi-million dollar discrepancy in the respective BFOs.

104.    It is believed and averred that despite the large disparity between the BFOs, SEPTA awarded the 2018-23 Jefferson-Suburban Contract to GDI based upon

SEPTA's subjective "Technical Ranking" of GDI and its subjective "Technical Rating" of TK, with SEPTA ranking GDI as "Very Good" and TK as "Acceptable."

105.    SEPTA gave GDI a higher Technical Ranking than it gave TK even though GDI had not previously done work for SEPTA, whereas TK had performed other contracts for SEPTA at various locations for years, and had performed them at a high level of proficiency.

106.    SEPTA's ranking of TK as "Acceptable" was an insufficient reason for SEPTA to select GDI over TK, especially when awarding the 2018-23 Jefferson-Suburban to TK would have resulted in a savings to SEPTA and the taxpayers of more than $4.3 million.

107.    In addition, under SEPTA's policies and procedures, a contractor's ranking for technical performance is to be based upon a record of "satisfactory" performance, a standard which TK was easily able to satisfy.

108.    Furthermore, under SEPTA's policies and procedures, and the law, SEPTA should have determined that TK was "the lowest responsive, responsible bidder" for the 2018-23 Jefferson-Suburban Contract since TK's BFO for the contract was more than $4.3 million lower than GDI's, and TK was rated by SEPTA as "Acceptable."

109.    In addition to awarding the 2018-23 Jefferson-Suburban Contract to GDI over TK even though GDI's BFO exceeded TK's BFO by more than $4.3 million, SEPTA agreed to pay and has paid certain costs incurred by GDI in connection with performing the Contract, which were not included or built into GDI's BFO of $15,778,036.

110.    Under SEPTA's policies and procedures, GDI's BFO should have included its costs and expenses, and SEPTA is not to be responsible for costs that exceed a contractor's BFO.

111.    Unlike GDI, TK's BFO for 2018-23 Jefferson-Suburban Contract included its costs.

112.    When the additional costs paid by SEPTA to or on behalf of GDI in connection with the 2018-23 Jefferson-Suburban Contract are taken into account, SEPTA and the taxpayers would have saved substantially more than $4.3 million had the Contract been awarded to TK.

## COUNT I

## 42 U.S.C. §1981 [Enforced Through § 1983]

## RACE DISCRIMINATION

113.    TK incorporates by reference, all of the allegations of Paragraphs 1 through 112, above, as if set forth fully and at length herein.

114.    At all relevant times, SEPTA acted under color of state law.

115.    While acting under color of state law, SEPTA deprived TK of its federal constitutional right to be free from racial discrimination in the making and enforcement of contracts.

116.    SEPTA discriminated against TK on the basis of race, in violation of §1981, when it excluded TK from the benefits, privileges, terms, and the right to make, perform and participate in the New Suburban Station Contract.

117.    SEPTA further discriminated against TK on basis of race, in violation of §1981, when it excluded TK from the benefits, privileges, terms, and the right to make, perform and participate in the 2018-23 Jefferson-Suburban Contract.

118.    Race was a motivating and/or determinative factor in SEPTA's decision to deny TK the benefits, privileges, terms, and the right to make, perform and participate in the New Suburban Station Contract.

119.    Race was a motivating and/or determinative factor in SEPTA's decision to deny TK the benefits, privileges, terms, and the right to make, perform and participate in the 2018-23 Jefferson-Suburban Contract.

120.    SEPTA's asserted reasons for denying TK the benefits, privileges, terms, and the right to make, perform and participate in the New Suburban Station Contract are pretexts for racial discrimination in violation of §1981.

121.    SEPTA's asserted reasons for denying TK the benefits, privileges, terms, and the right to make, perform and participate in the 2018-23 Jefferson-Suburban Contract are pretexts for racial discrimination in violation of §1981.

122.    In discriminating against TK on the basis of race with respect to the Contracts, SEPTA violated, disregarded and failed to adhere to the pertinent regulations, policies and procedures intended to protect DBEs.

123.    SEPTA is liable for the deprivations of TK's rights under §§1981 and 1983 because an official policy of SEPTA caused the deprivations.

124.    The decisions to deprive TK of the benefits, privileges, terms, and the right to make, perform and participate in the Contracts were officially made, authorized

and directed by the SEPTA Board, which had and was given policymaking and decisionmaking authority on behalf of SEPTA under state law.

125.    By depriving TK of the of the benefits, privileges, terms, and the right to make, perform and participate in the Contracts, the SEPTA Board made a deliberate choice to follow a particular course of action.

126.    The official policy of SEPTA, as authorized, implemented and directed by the Board, was a motivating and/or determinative cause of, and a moving force behind the said deprivations of TK's rights.

127.    As a result of SEPTA's deprivations of TK's rights under §1981, TK has suffered, is continuing to suffer and will suffer a loss of income and profits totaling in excess of $2.25 million, as well as other monetary losses.

128.    As a further result of the said deprivations, TK has suffered, does suffer and will suffer harm and damage to its reputation.

129.    As a further result of the said deprivations, TK has incurred and will incur attorney's fees and costs.

## COUNT II

## 42 U.S.C. §2000d [Title VI]

## RACE DISCRIMINATION

130.    TK incorporates by reference, all of the allegations of Paragraphs 1 through 129, above, as if set forth fully and at length herein.

131.    At all relevant times, SEPTA was subject to the provisions and requirements of Title VI.

24

132.   In violation of Title VI, SEPTA, as a program or activity receiving federal financial funding and assistance, excluded TK from participating in, and denied TK the benefits of the New Suburban Station Contract, on the basis of race.

133.   In further violation of Title VI, SEPTA, as a program or activity receiving federal financial finding and assistance, excluded TK from participating in, and denied TK the benefits of the 2018-23 Jefferson-Suburban Contract, on the basis of race.

134.   Race was a motivating and/or determinative factor in SEPTA's decision to exclude TK from participating in, and to deny TK the benefits of the New Suburban Station Contract.

135.   Race was a motivating and/or determinative factor in SEPTA's decision to exclude TK from participating in, and to deny TK the benefits of the 2018-23 Jefferson-Suburban Contract.

136.   SEPTA's asserted reasons for excluding TK from participating in, and denying TK the benefits of the New Suburban Station Contract are pretexts for racial discrimination in violation of Title VI.

137.   SEPTA's asserted reasons for excluding TK from participating in, and denying TK the benefits of the 2018-23 Jefferson-Suburban Contract are pretexts for racial discrimination in violation of Title VI.

138.   In discriminating against TK on the basis of race with respect to the Contracts, SEPTA violated, disregarded and failed to adhere to the pertinent regulations, policies and procedures intended to protect DBEs.

139.    As a result of SEPTA's violations of Title VI, TK has suffered, is continuing to suffer and will suffer a loss of income and profits totaling in excess of $2.25 million, as well as other monetary losses.

140.    As a further result of the said violations, TK has suffered, does suffer and will suffer harm and damage to its reputation.

141.    As a further result of the said violations, TK has incurred and will incur attorney's fees and costs.

### COUNT III

### 42 U.S.C. §1983

### SEX DISCRIMINATION

142.    TK incorporates by reference, all of the allegations of Paragraphs 1 through 141, above, as if set forth fully and at length herein.

143.    At all relevant times, SEPTA acted under color of state law.

144.    While acting under color of state law, SEPTA deprived TK of its federal constitutional right, guaranteed by the Equal Protection Clause, to be free from discrimination on the basis of sex.

145.    SEPTA discriminated against TK on the basis of sex, in violation of §1983, when it excluded TK from and participating in, and denied TK the benefits of the New Suburban Station Contract.

146.    SEPTA further discriminated against TK on the basis of sex, in violation of §1983, when it excluded TK from participating in, and denied TK the benefits of the 2018-23 Jefferson-Suburban Contract.

147.    Sex was a motivating and/or determinative factor in SEPTA's decision to exclude TK from participating in, and to deny TK the benefits of the New Suburban Station Contract.

148.    Sex was a motivating and/or determinative factor in SEPTA's decision to exclude TK from participating in, and to deny TK the benefits of the 2018-23 Jefferson-Suburban Contract.

149.    SEPTA's asserted reasons for excluding TK from participating in, and denying TK the benefits of the New Suburban Station Contract are pretexts for sex discrimination in violation of §1983.

150.    SEPTA's asserted reasons for excluding TK from participating in, and denying TK the benefits of the 2018-23 Jefferson-Suburban Contract are pretexts for sex discrimination in violation of §1983.

151.    In discriminating against TK on the basis of sex with respect to the Contracts, SEPTA violated, disregarded and failed to adhere to the pertinent regulations, policies and procedures intended to protect DBEs.

152.    SEPTA is liable for the deprivations of TK's rights under §1983 because an official policy of SEPTA caused the deprivations.

153.    The decisions to exclude TK from participating in, and to deny TK the benefits of the Contracts were officially made, authorized and directed by the SEPTA Board, which had and was given policymaking and decisionmaking authority on behalf of SEPTA under state law.

154.    By excluding TK from participating in, and denying TK the benefits of the Contracts, the SEPTA Board made a deliberate choice to follow a particular course of action.

155.    The official policy of SEPTA, as authorized, implemented and directed by the Board, was a motivating and/or determinative cause of, and a moving force behind the said deprivations of TK's rights.

156.    As a result of the SEPTA's deprivations of TK's rights under §1983, TK has suffered, is continuing to suffer and will suffer a loss of income and profits totaling in excess of $2.25 million, as well as other monetary losses.

157.    As a further result of the said deprivations, TK has suffered, does suffer and will suffer harm and damage to its reputation.

158.    As a further result of the said deprivations, TK has incurred and will incur attorney's fees and costs.

## COUNT IV

## 42 U.S.C. §§1981 and 1983

## RETALIATION

159.    TK incorporates by reference, all of the allegations of Paragraphs 1 through 158, above, as if set forth fully and at length herein.

160.    TK engaged in protected activity for purposes of §§1981 and 1983 when it sent the letter to Babcock on October 26, 2017, and when Thoa informed Patel on October 20, 2017 that TK intended to consult with an attorney about pursuing a claim against SEPTA (collectively, "Protected Activity").

28

161.   The Protected Activity was sufficient to put SEPTA on notice that TK was claiming that SEPTA's decision to "re-award" the New Suburban Station Contract to CCD was an act of discrimination based on race and sex.

162.   In engaging in the Protected Activity, TK had a good faith, reasonable belief that SEPTA had violated its right to be free from racial and sex discrimination.

163.   After excluding TK from the New Suburban Station Contract, SEPTA had no opportunity to retaliate against TK with respect to a bid for a contract to perform services at Jefferson or Suburban Station until October 2018, when SEPTA invited and received bids for the 2018-23 Jefferson-Suburban Contract.

164.   After TK had engaged in the Protected Activity, SEPTA, acting under color of state law, subjected TK to a materially adverse action, when it selected GDI over TK as the successful bidder for the 2018-23 Jefferson-Suburban Contract, even though TK's bid was millions of dollars lower than GDI's; TK was the lowest responsive and/or responsible bidder; TK has had a long track record of good performance for SEPTA; and GDI had never before worked for SEPTA.

165.   The materially adverse action that was taken by SEPTA against TK following the Protected Activity might well have dissuaded a reasonable person or entity from protesting, opposing or complaining of racial and/or sex discrimination.

166.   There was a causal connection between the Protected Activity and SEPTA's decision to select GDI over TK to perform the 2018-23 Jefferson-Suburban Contract.

167.   The Protected Activity was a motivating and/or determinative factor in SEPTA's decision to award the 2018-23 Jefferson-Suburban Contract to GDI, and not to TK.

168.   SEPTA's retaliatory action against TK in violation of §1981 and §1983 was an official policy of SEPTA that was approved, authorized and directed by the SEPTA Board, which had and was given policymaking and decisionmaking authority on behalf of SEPTA under state law.

169.   By engaging in the said retaliatory action, the SEPTA Board made a deliberate choice to follow a particular course of action.

170.   The official policy of SEPTA, as approved, authorized and directed by the Board, was a motivating and/or determinative cause of, and a moving force behind the retaliatory action.

171.   As a result of SEPTA's retaliatory action, TK has suffered, is continuing to suffer and will suffer a loss of income and profits totaling in excess of $2.25 million, as well as other monetary losses.

172.   As a further result of the retaliatory action, TK has suffered, does suffer and will suffer harm and damage to its reputation.

173.   As a further result of the retaliatory action, TK has incurred and will incur attorney's fees and costs.

## COUNT V

## 42 U.S.C. §2000d (Title VI)

## RETALIATION

174.   TK incorporates by reference, all of the allegations of Paragraphs 1 through 173, above, as if set forth fully and at length herein.

175.   The Protected Activity implicates Title VI.

176.   The Protected Activity was sufficient to put SEPTA on notice that TK was claiming that SEPTA's decision to "re-award" the New Suburban Station Contract to CCD was an act of racial discrimination.

177.   In engaging in the Protected Activity, TK had a good faith, reasonable belief that SEPTA had violated its right to be free from racial discrimination.

178.   After TK had engaged in the Protected Activity, SEPTA subjected TK to a materially adverse action when it selected GDI over TK as the successful bidder for the 2018-23 Jefferson-Suburban Contract, even though TK's bid was millions of dollars lower than GDI's; TK was the lowest responsive and/or responsible bidder; TK has had a long track record of good performance for SEPTA; and GDI had never before worked for SEPTA.

179.   The materially adverse action that was taken by SEPTA against TK following the Protected Activity might well have dissuaded a reasonable person or entity from protesting, opposing or complaining of racial discrimination.

180.   There was a causal connection between the Protected Activity and SEPTA's decision to select GDI over TK to perform the 2018-23 Jefferson-Suburban Contract.

181.    TK's Protected Activity was a motivating and/or determinative factor in SEPTA's decision to award the 2018-23 Jefferson-Suburban Contract to GDI, and not to TK.

182.    As a result of SEPTA's retaliatory action in violation of Title VI, TK has suffered, is continuing to suffer, and will suffer a loss of income and profits totaling in excess of $2.25 million, as well as other monetary losses.

183.    As a further result of SEPTA's retaliatory action in violation of Title VI, TK has suffered, does suffer and will suffer harm and damage to its reputation.

184.    As a further result of SEPTA's retaliatory action in violation of Title VI, TK has incurred and will incur attorney's fees and costs.

## PRAYER FOR RELIEF

TK prays that the Court grant it the following relief:

(a)    Declaring that the acts and practices of SEPTA complained of herein to be in violation of §1981, §1983 and Title VI;

(b)    Granting equitable relief ordering SEPTA to refrain from committing further violations of §1981, §1983 and Title VI, and compelling it to take appropriate measures to prevent such violations;

(c)    Awarding compensatory damages to TK for loss of income, lost profits and additional monetary losses caused by SEPTA's violations of §1981, §1983 and Title VI;

(d)    Awarding compensatory damages to TK for harm to its reputation caused by SEPTA's violations of §1981, §1983 and Title VI;

(e)    Awarding TK reasonable attorney's fees and costs;

  
   (f)     Awarding interest to TK; and

   (g)     Granting such other and further relief to TK that the Court deems

just and appropriate.


_____
Robert A. Davitch, Esq.
**Sidkoff, Pincus & Green, P.C.**
1101 Market Street, Suite 2700
Philadelphia, PA 19107
(215) 574-0600 - Office
rad@sidkoffpincusgreen.com

_____
Sidney L. Gold, Esq.
**Sidney L. Gold & Associates, P.C.**
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999 – Office
SGold@DiscrimLaw.net

Attorneys for Plaintiff, TK Keystone
Construction Company, Inc.

Dated:  _9/27/2019_____